UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NATCHEZ J. MORICE, III, M.D.                    CIVIL ACTION

VERSUS                                           NO. 18-7945

HOSPITAL SERVICE DISTRICT #3,                    SECTION M (3)
*et al.*

## ORDER & REASONS

Before the Court is a motion for preliminary injunction[1] filed on behalf of the plaintiff, Natchez J. Morice, III, M.D. ("Dr. Morice"). Hospital Service District No. 3 Parish of Lafourche d/b/a Thibodaux Regional Medical Center ("TRMC"), Board of Commissioners of Thibodaux Regional Medical Center ("the Board"), Medical Executive Committee of Thibodaux Regional Medical Center ("MEC"), Credentials Committee of Thibodaux Regional Medical Center ("Credentials Committee"), and Greg Stock ("Stock"), the CEO of TRMC (collectively, "Defendants"), oppose the motion.[2] Dr. Morice filed a supplemental memorandum in support of his motion for injunctive relief.[3] The Court held an evidentiary hearing on March 28, 2019.[4] Having considered the parties' memoranda, the evidence (including exhibits and testimony), argument presented at the hearing, and the applicable law, the Court issues this Order & Reasons.

**I.    BACKGROUND**

This litigation arises from TRMC's suspension and denial of Dr. Morice's clinical privileges in obstetrics at TRMC.[5] TRMC's Medical Staff Bylaws ("Bylaws") require a physician

---

[1] R. Doc. 54. The motion also requested a temporary restraining order, which the Court denied at a hearing on February 15, 2019. R. Doc. 60.
[2] R. Docs. 59, 68.
[3] R. Doc. 73.
[4] R. Doc. 71.
[5] R. Doc. 64 at 4.

to apply for renewal of privileges at TRMC every two years.[6] As part of the written application, a physician must demonstrate "ability to work cooperatively with others," "provide peer recommendations," agree to continued peer review and quality review, and report any violations assessed by the MEC.[7] The Credentials Committee initially reviews the application and makes a recommendation to the MEC, which, in turn, makes a recommendation to the Board, which renders the final decision.[8] Under Article VII of the Bylaws, if the MEC makes an "adverse recommendation," the physician may generally initiate the "Hearing Procedure" set out in Article XI, which provides for a hearing conducted by a "Hearing Committee" (or Hearing Panel) and appellate review by the Board.[9] According to the Bylaws, the recommendation forming the basis of the hearing and appeal does not become "effective and final" until the Board's determination upon final review.[10]

TRMC first granted Dr. Morice privileges in obstetrics and gynecology in 2006. Following notice of five violations spanning from late 2014 to early 2017, however, the MEC recommended corrective action in relation to Dr. Morice's privileges in obstetrics.[11] The violations, which Dr. Morice maintains were fabricated, involved Dr. Morice's failure to promptly attend to his obstetrical patients.[12] Dr. Morice then requested a hearing under Article XI,[13] which took place on April 24-26, 2018, and May 8, 2018.[14] On June 13, 2018, the Hearing Panel rendered a decision

---

[6] *See* R. Docs. 54-7 at 9; 59-1 at 9.
[7] *See* R. Docs. 54-7 at 8-10, 32-36; 59-1 at 8-10, 32-36.
[8] R. Docs. 54-7 at 28-31; 59-1 at 28-31.
[9] *See* R. Docs. 54-7 at 6, 22, 29; 59-1 at 6, 22, 29. Although Article VII refers to the "Hearing Procedure as outlined in Article X," Article X addresses "Corrective Action," whereas Article XI addresses the "Hearing and Appellate Review Procedure." It is apparent, then, that this is a typographical error, and the reference in Article VII should be to the "Hearing Procedure as outlined in Article *XI*."
[10] R. Docs. 54-7 at 41; 59-1 at 41.
[11] R. Doc. 54-1 at 10-11.
[12] *See* R. Doc. 54-8 at 3.
[13] R. Doc. 54-4.
[14] R. Doc. 54-1 at 13.

2

to affirm the MEC's decision to suspend Dr. Morice.[15] Following Dr. Morice's appeal to the Board, the Board affirmed the Hearing Panel's decision on August 13, 2018, suspending Dr. Morice's privileges in obstetrics for a period of six months, until February 13, 2019.[16]

Meanwhile, because Dr. Morice's two-year privileges appointment was set to expire on May 16, 2018, in the midst of the hearing-and-appeal process,[17] the Board extended Dr. Morice's privileges "until the earlier to occur of (i) the expiration of 4 months from May 15, 2018, the date of reappointment, or (ii) such time as the hearing before the ad hoc medical staff committee … and the appellate review by the Board … have concluded and a final decision has been rendered as set forth in Article XI of the TRMC Medical Staff Bylaws."[18] In this case, the latter term applied. Therefore, in the August 13, 2018 letter that informed Dr. Morice of the Board's final decision, Stock advised Dr. Morice to "submit your application for reappointment and clinical privileges for review by the Credentials Committee as soon as possible."[19] Dr. Morice heeded Stock's instruction to make quick application for reappointment only as to his gynecological privileges. This application was submitted on August 16, 2018,[20] and TRMC approved his reappointment application a month later.[21] However, Dr. Morice waited to apply for privileges in obstetrics until December 17, 2018.[22] The MEC recommended denial of his application for obstetrical privileges on January 14, 2019, citing a new violation of the professional standard of care and a variance report of unprofessional behavior in addition to the conduct for which Dr.

---

[15] R. Doc. 54-8.
[16] R. Doc. 54-3.
[17] *See* R. Doc. 54-11 at 1.
[18] R. Doc. 59-2; *see also* R. Doc. 54-3 at 1.
[19] R. Doc. 54-3 at 1.
[20] R. Doc. 59-3. The application was structured as a joint application for GYN and OB privileges, but Dr. Morice scratched out the "Obstetrics" portion of the application.
[21] R. Doc. 59-4.
[22] R. Doc. 59-5.

3

Morice was suspended.[23] Dr. Morice is currently pursuing the hearing-and-appeal process as to the denial of his application for obstetrical privileges. TRMC declined to grant Dr. Morice temporary obstetrical privileges during the pendency of his appeal.[24]

In his amended complaint and application for preliminary injunction,[25] Dr. Morice alleges that TRMC was obligated to reinstate his obstetrical privileges after his suspension lifted, despite the fact that TRMC had, in the interim, denied his application for such privileges on the basis of the new violations when considered with his past violations. Dr. Morice essentially argues that the sense of the word "suspension" implies that his obstetrical privileges would go back into effect after the suspension ran, and that, under the Bylaws, the denial of his application for reappointment as to his obstetrical privileges does not take effect until the Board's final decision on his appeal of such denial. Therefore, Dr. Morice claims he is entitled to exercise obstetrical privileges until the hearing-and-appeal process is complete.[26] Dr. Morice alleges that the Bylaws constitute a contract and that Defendants breached their contractual obligations to him, breached this contract (the Bylaws) in bad faith, and tortiously interfered with his rights under the Bylaws. Further, Dr. Morice alleges that Defendants committed an abuse of rights and negligent misrepresentations, intentionally inflicted emotional distress and defamed him, violated the Louisiana Unfair Trade Practices and Consumer Protection Law, violated his due process and equal protection rights, and violated the Health Care Quality Improvement Act ("HCQIA").[27]

---

[23] R. Doc. 59-6.
[24] R. Doc. 54-6.
[25] In November of 2018, under the fictitious name "Plaintiff Doctor," Dr. Morice initially sought to enjoin TRMC from taking adverse action relating to his suspension. R. Docs. 1, 22. Defendants filed a motion to dismiss, asserting, *inter alia*, that Dr. Morice failed to show exceptional circumstances warranting anonymous suit, and the Court agreed. R. Docs. 21, 52. In compliance with the Court's order to re-file the complaint under his true identity, Dr. Morice applied for new injunctive relief based upon TRMC's denial of his application for obstetrical privileges. R. Doc. 54. Because Dr. Morice's suspension ended on February 13, 2019, his initial motion for preliminary injunction (R. Doc. 22) is now moot, as is his request to set a status conference regarding same (R. Doc. 20).
[26] R. Docs. 53-2 at 19-21, 38-40; 54-1 at 18; 73 at 15.
[27] R. Doc. 53-1 at 25-42.

**II.     PENDING MOTION**

Dr. Morice's motion for preliminary injunction seeks reinstatement of Dr. Morice's obstetrical privileges pending the outcome of the ongoing hearing and appeal of TRMC's denial of his December 2018 application for such privileges. Dr. Morice argues that, because the Bylaws state that an adverse recommendation – here, the decision to deny privileges – is not "final and effective" until the Board renders its decision as part of the hearing-and-appeal process, he is contractually entitled to privileges in the interim. Dr. Morice argues that Defendants unilaterally and impermissibly altered the two-year period of his privileges reappointments (which ran from May to May) by extending the period ending on May 16, 2018, to August 13, 2018. By so doing, says Dr. Morice, Defendants created a trap for Dr. Morice's privileges to lapse, so they could shut him out of local competition for obstetrical services.[28] Because Dr. Morice served the entirety of his suspension and complied with all related conditions, Dr. Morice contends that the denial of his reappointment of obstetrical privileges is largely based upon the same "trumped up" allegations for which he was already punished.[29] Moreover, Dr. Morice says he believed his privileges were to go back into effect at the end of his "suspension" because such a penalty plainly effected a temporary removal of privileges and not an outright termination. And Dr. Morice claims that his application for reappointment of obstetrical privileges was timely in that he submitted it two months before the end of his suspension.[30]

Dr. Morice argues that his obstetrical patients scheduled to give birth and undergo birth-related procedures now lack medical care and will suffer irreparable injury.[31] Dr. Morice also argues that, without obstetrical privileges to support his obstetrics practice, his medical practice

---

[28] R. Doc. 73 at 12-17.
[29] R. Doc. 54-1 at 35-36.
[30] Oral argument at March 28, 2019 hearing. *See* R. Doc. 71.
[31] R. Docs. 54-1 at 36; 73 at 18-19.

5

will suffer an incalculable amount of damages and likely dissolve, and that Dr. Morice himself will be unable to sustain the litigation.[32] Dr. Morice submits a letter from TRMC reprimanding him for inadequate call coverage for his gynecological patients to suggest that his gynecological privileges are now in jeapordy.[33] Dr. Morice's declaration and testimony at the evidentiary hearing repeated these assertions in conclusory fashion.[34]

Defendants argue that Dr. Morice lacks standing to assert irreparable injury on behalf of his patients,[35] but nonetheless, they point to the declaration of TRMC Chief Quality Resource Officer and Compliance Officer Dana Rodrigue, in which she attests that the hospital's OB/GYN physicians provide care to Dr. Morice's patients when his chosen substitute physicians, Dr. Lisa Colon and Dr. Judith Blaise, are unavailable.[36] Thus, Defendants contend that Dr. Morice's damages are simply economic and reparable.[37] To the extent Dr. Morice says he suffers exceptional economic damages that warrant injunctive relief, Defendants note that Dr. Morice still maintains gynecological privileges and carries on that portion of his practice.[38] Overall, Defendants say a preliminary injunction is inappropriate because the grant of temporary obstetrical privileges would usurp the hospital's peer review process in violation of the primary jurisdiction doctrine.[39]

Furthermore, Defendants argue that issuing a preliminary injunction is inappropriate because doing so would not preserve the status quo but would give Dr. Morice new and unwarranted provisional privileges, thus placing Dr. Morice in a superior position to the one he

---

[32] R. Docs. 54-1 at 38-40; 73 at 19-26.
[33] R. Doc. 71-3.
[34] R. Docs. 71-2 at 1-6, 73-1 at 1-6.
[35] R. Doc. 68 at 9-11.
[36] R. Doc. 68-1.
[37] R. Doc. 68 at 10.
[38] *Id.* at 11-13.
[39] *Id.* at 13-14.

now occupies. Defendants claim that TRMC only extended Dr. Morice's then-existing privileges pending the outcome of his suspension appeal because the privileges he then had were set to expire in the midst of that process. But here, Dr. Morice began the hearing-and-appeal process related to the denial of obstetrical privileges after his privileges had already expired. Hence, Defendants argue, because Dr. Morice had no current obstetrical privileges when he appealed the denial of his reappointment to such privileges, the Court should maintain the status quo by allowing the internal hospital hearing procedures to run their course without extending temporary or provisional privileges.[40]

## III. LAW & ANALYSIS

### A. Preliminary Injunction Standard

A movant seeking a preliminary injunction must establish (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant if the injunction is denied outweighs the potential harm to the non-movant if the injunction is granted; and (4) that granting the injunction will not disserve the public interest. *Garcia v. Jones*, 910 F.3d 188, 190 (5th Cir. 2018). "A preliminary injunction is an extraordinary remedy which courts grant only if the movant has clearly carried the burden as to all four elements." *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003). A preliminary injunction "may only be awarded upon a clear showing that the [movant] is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and is never awarded as a matter of right but only within the sound discretion of the district court. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted); *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). "The

---

[40] *Id.* at 7-9.

purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Tex. v. Camensich*, 451 U.S. 390, 395 (1981); *see Atwood Turnkey Drilling, Inc. v. Petroleo Brasilerio, S.A.*, 875 F.2d 1174, 1178 (5th Cir. 1989). Ultimately, granting a preliminary injunction "is the exception rather than the rule." *Miss. Power & Light Co.*, 760 F.2d at 621.

Generally, a federal court does not render a final judgment on the merits at the preliminary injunction stage; and when it does not render a final judgment, its findings of fact and conclusions of law are not binding at a trial on the merits. *Camensich*, 451 U.S. at 395. Additionally, "at the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence. Thus, the district court can accept evidence in the form of deposition transcripts and affidavits." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993).

**B. Substantial Likelihood of Success on the Merits**

"To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). A preliminary injunction should not issue if "the law on the question at the heart of the dispute does not favor [the movant's] position." *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 225 (5th Cir. 2010).

Although Dr. Morice asserts several causes of action in his amended complaint, his motion for a preliminary injunction principally relies upon his claims that the Bylaws constitute a contract

8

Defendants breached and that they violated due process.[41] Essentially, Dr. Morice argues that Defendants' breach of the Bylaws deprived him of rights guaranteed by the Bylaws.[42] For purposes of this request for preliminary injunction, however, Dr. Morice has not demonstrated a substantial likelihood of prevailing on his claims that Defendants breached the contract or denied him due process.

---

[41] *See* R. Doc. 73 at 12-17. Dr. Morice does not rely upon his antitrust, unfair competition, tortious interference with a contract, abuse of rights, misrepresentation, intentional infliction of emotional distress, and defamation claims in support of his motion for preliminary injunction. He provides no evidence but only the barest of argument as to such claims. *See* R. Docs. 54-1 at 34-35; 30 at 22-38. As a result, Dr. Morice fails to establish a prima facie case as to these claims. In support of his equal protection claim, Dr. Morice provides only four pages of a transcript from a hearing on April 25, 2018, in which counsel for Dr. Morice asked a representative of TRMC about TRMC's failure to take corrective action against Dr. Bloss, another physician with obstetrical privileges at TRMC who allegedly engaged in the same kind of contact for which Dr. Morice was disciplined and yet was not disciplined. *See* R. Docs. 54-1 at 32-34; 54-15. Even if TRMC treated Dr. Bloss differently than Dr. Morice on the basis of similar conduct, this limited evidence is hardly sufficient to show TRMC had no rational basis for such treatment. *See Shaw v. Hosp. Auth. of Cobb Cty.*, 507 F.2d 625, 628 (5th Cir. 1975) (rational basis test applies to eligibility requirements for hospital staff privileges). Finally, Dr. Morice's allegations of due process premised upon the HCQIA fail because the HCQIA does not explicitly or implicitly afford aggrieved physicians a cause of action. *See Wayne v. Genesis Med. Ctr.*, 140 F.3d 1145, 1148 (8th Cir. 1998) ("[T]he Act was not enacted to benefit the physician undergoing peer review."); *Schmidt v. Principal Health Care of La., Inc.*, 1996 WL 264990, at *3-4 (E.D. La. May 16, 1996).

[42] To the extent Dr. Morice continues to make a due process claim based upon Defendants' actions relating to Dr. Morice's suspension (*viz.*, the Bylaws' alleged failure to establish a burden of proof for the hearing-and-appeal procedure), or a breach-of-contract claim in relation to Dr. Morice's suspension, those arguments are now moot for purposes of this request for preliminary injunction, which focuses on the January 2019 denial of Dr. Morice's obstetrical privileges. *See* R. Doc. 54-1 at 23-26; *supra* note 25. Further, insofar as Dr. Morice alleges a due process claim for the denial of his obstetrical privileges, such a claim is premature because Dr. Morice is currently pursuing an appeal through TRMC's administrative proceedings. However, even if Dr. Morice is now arguing that he is denied due process in these proceedings for the Bylaws' failure to address the burden of proof, he is unlikely to succeed on this claim. "[T]he essential requirements of procedural due process under the Constitution are notice and an opportunity to respond." *Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 562 (5th Cir. 2003). In his suspension proceedings, Dr. Morice argued that the Bylaws were silent as to the burden of proof. *See* R. Doc. 54-1 at 23-24. The Bylaws permit briefing "concerning any issue of procedure or of record" both "prior to or during the hearing." R. Docs. 54-7 at 39; 59-1 at 39. Prior to the suspension hearing, Dr. Morice submitted briefing addressing the burden of proof. *See* R. Doc. 54-1 at 13, 24. He argued that the Bylaws supported a "clear and convincing evidence" standard rather than the "preponderance of the evidence" standard that was employed. *Id.* at 24-25. Yet, Dr. Morice does not allege that the burden, once established, was improperly applied. The evidence before the Court shows that the Bylaws' silence on the burden of proof did not deprive Dr. Morice of notice and opportunity to be heard. *See Zamanian v. Jefferson Par. Hosp. Serv. Dist. No. 2*, 747 F. App'x 982, 982 (5th Cir. 2019) (affirming dismissal of due process claims for failure to state a claim where "[p]laintiff's suspension was reviewed by two separate committees, a panel of physicians over a three-day hearing, and the hospital's Board of Directors" and "[h]e conducted discovery, presented and cross-examined witnesses, submitted affidavits, and gave his statement on the incident through writing and before the different committees/panels"); *Soriano v. Neshoba Cty. Gen. Hosp. Bd. of Trs.*, 486 F. App'x 444, 446 (5th Cir. 2012) (due process afforded where physician had "multi-step peer review and appeal process pursuant to the hospital's medical staff by-laws").

To succeed on a breach-of-contract claim in Louisiana, a plaintiff must show "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Favrot v. Favrot*, 68 So. 3d 1099, 108-09 (La. App. 2011). Defendants do not contest that the Bylaws create contractual obligations, and the Court accepts, without deciding on the merits, that the Bylaws formed a contract between Dr. Morice and TRMC. *See Granger v. Health Ctr. La.*, 144 So.3d 736, 762 (La. 2013) (bylaws of hospital may form a contract between the hospital and its medical staff). Defendants challenge, though, Dr. Morice's contention that they did not fulfill their obligations to him under the Bylaws. Defendants urge that Dr. Morice misreads the Bylaws. The Court agrees.

"When words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La Civ. Code art. 2046. "A contract is interpreted by a determination of the common intent of the parties, giving the contractual words their generally prevailing meaning." *Franklin v. Fountain Grp. Adjusters, L.L.C.*, 249 So. 3d 84, 90 (La. App. 2018) (citing La. Civ. Code arts. 2045 & 2047). "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as whole." La. Civ. Code art. 2050. "A contract has the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom." *Guidry v. USAgencies Cas. Ins. Co.*, 213 So. 3d 406, 418 (La. App. 2017).

Article III of the Bylaws provides that "[m]embership on the Medical Staff of [TRMC] is a privilege and not a right of any practitioner" and it "may be extended only to physicians … who meet the qualifications set forth in these Bylaws."[43] "Appointment to the staff will confer on the

---

[43] R. Docs. 54-7 at 7; 59-1 at 7.

10

appointee only those clinical privileges granted by the Board after recommendation by an appropriate Medical Staff committee."[44] Under Article VII, a physician is conferred clinical privileges "on the basis of criteria which have been designed to assure that the patient receives quality care," including "documented qualifications, current licensure, relevant training and/or experience, mental and physical health status, competence, peer recommendations, outcomes of treatment and results of quality improvement studies,"[45] and by means of an extensive application process explained in Article VIII.[46] Thus, to obtain privileges at TRMC, a physician must apply and satisfy certain qualifications.

But, to maintain privileges at TRMC, a physician must periodically reapply for privileges, as discussed in the "Conditions and Duration of Appointment/Clinical Privileges" section of Article III:

> 2. Initial appointments are provisional, will be for a period of one (1) year and may be renewed once for an additional year. If the appointee is granted regular staff membership at the end of the provisional period, such status is valid until the end of the Medical Staff appointment cycle, at which time application for reappointment must be made. Reappointments will be for a period of not more than two (2) years.
>
> 3. Any modification of appointment or clinical privileges will be granted only for the remainder of the term of the practitioner's current appointment, at which time the practitioner will be subject to the reappointment/renewal process.[47]

Although the Bylaws do not explicitly discuss the consequence of a physician's failure to reapply for privileges, the requirement for periodic reapplication implies that privileges lapse at the end of the reappointment term.

---

[44] R. Docs. 54-7 at 7; 59-1 at 7.
[45] R. Docs. 54-7 at 21; 59-1 at 21.
[46] R. Docs. 54-7 at 27-30; 59-1 at 27-30.
[47] R. Docs. 54-7 at 9; 59-1 at 9.

11

Article VIII explains the "Procedure for Appointment/Clinical Privileges,"[48] and Article IX (erroneously designated Article *V*IX) explains the "Procedure for Reappointment/Renewal of Clinical Privileges,"[49] whereby the Credentials Committee reviews the application and makes a recommendation to the MEC, which in turn makes a recommendation to the Board.[50] In the event the MEC makes an "adverse recommendation," defined as "a recommendation to deny, restrict, reduce, modify, curtail, suspend, revoke, censure, reprimand, place on probation or fail to renew clinical privileges or appointment … for a reason related to professional competence or professional conduct,"[51] in relation to "the granting of clinical privileges" as outlined in Article VII, the physician may "initiate the Hearing Procedure as outlined in Article X[I], unless otherwise so stated in the Bylaws."[52] Further, an adverse recommendation with respect to clinical privileges or appointment requires notice be given to the practitioner, including "the reasons for the recommendation."[53]

Article XI outlines the "Hearing and Appellate Review Procedure," whereby a physician is entitled to a "hearing before an ad hoc Committee of the Medical Staff" and "appellate review by the Governing Board" in the event of a timely request after receiving notice of an adverse recommendation relating to his or her clinical privileges.[54] In the event a physician waives his or her right to appeal the adverse recommendation, the MEC's recommendation "shall become final and effective against the practitioner after ratification by the Board."[55] But, if the physician

---

[48] R. Docs. 54-7 at 27-30; 59-1 at 27-30.
[49] R. Docs. 54-7 at 30-31; 59-1 at 30-31.
[50] *See* R. Docs. 54-7 at 28-30, 31.
[51] R. Docs. 54-7 at 6; 59-1 at 6.
[52] R. Docs. 54-7 at 22; 59-1 at 22; *see supra* note 9; *see also* R. Docs. 54-7 at 29; 59-1 at 29 (under Article VII, "[i]f the recommendation of the [MEC] is adverse to the practitioner, he/she may initiate the hearing procedure as outlined in Article X[I] unless otherwise so stated in the Bylaws").
[53] R. Docs. 54-7 at 29; 59-1 at 29.
[54] R. Docs. 54-7 at 37; 59-1 at 37.
[55] R. Docs. 54-7 at 37, 40; 59-1 at 37, 40.

12

exercises his or her right to a hearing and appeal, as Dr. Morice did here, Article XI, Section 7 contemplates that the MEC's recommendation does not take effect until the administrative review is complete:

> Within five (5) business days after the conclusion of the appellate review procedure, the Governing Board shall render its decision in the case and shall send notice thereof … to the affected practitioner …. If the Board's decision is in accordance with the [MEC's] last recommendation in the matter, the decision shall become immediately effective and final, and shall not be subject to any further hearing or appellate review. If the Board's decision is contrary to the [MEC's] last such recommendation in the matter, the Governing Board shall refer the matter to the Joint Conference Committee for further review and recommendation within five (5) business days. At its next meeting after receipt of the Joint Conference Committee's recommendation, the Governing Board shall make its final decision.[56]

It is undisputed that Dr. Morice exercised his Article XI hearing-and-appeal rights with respect to his six-month suspension and then again with respect to TRMC's denial of his application for reappointment of obstetrical privileges. But Dr. Morice's contention that he should have obstetrical privileges pending the Board's final decision of the MEC's recommendation to deny his reappointment is unsupported by a holistic reading of the Bylaws in conjunction with the chronology of this case. An appealed adverse recommendation is not effective until the Board's final decision, but this tenet does not avail Dr. Morice here. When Dr. Morice first appealed the MEC's recommendation to take corrective action and suspend him, Defendants permitted his lapsing privileges (both obstetrical and gynecological) to remain in place until the Board's final decision. Although Dr. Morice contends that Defendants' extension of his privileges pending the first hearing violated the two-year period of privileges delineated in Article III,[57] Defendants' extension is more properly characterized as a grant of "temporary privileges" under Article VII, Section 2 pending the mandate in Section 7 of Article XI that the adverse recommendation – here,

---

[56] R. Docs. 54-7 at 41; 59-1 at 41.
[57] R. Doc. 73 at 13.

13

the suspension of privileges – not take effect until the Board's final decision.[58] Thus, Defendants acted in May to extend Dr. Morice's privileges for the balance of the period of appellate review of his suspension. Otherwise, Dr. Morice's privileges would have expired in the midst of the administrative proceedings relating to his suspension.

But now, having served his suspension, and based upon an out-of-context and oversimplified understanding of "suspension" as a temporary penalty, Dr. Morice argues that his obstetrical privileges should come back into effect pending the hospital's review of the MEC's recommendation to deny his reappointment of obstetrical privileges. This construction is unsupported by the Bylaws. Article III places the burden on the physician to reapply for privileges at least every two years. TRMC's August 13, 2018 letter to Dr. Morice gave him explicit notice that his reappointment term would end when his suspension began (on August 13) and that he should apply for reappointment for clinical privileges as soon as possible.[59] Instead of reapplying immediately after his suspension began, as he did for gynecological privileges, Dr. Morice permitted his obstetrical privileges to lapse. A reading of the Bylaws makes clear that privileges are not granted as a matter of right but are only extended if a physician satisfies certain standards and follows the application process. In this case, Dr. Morice waited until December 2018 to apply for obstetrical privileges, after allegedly committing two more violations in addition to the conduct for which he was suspended. The MEC recommended denial of his application on this basis, and Dr. Morice sought review under the Bylaws. Thus, while the decision to deny Dr. Morice's reappointment for obstetrical privileges will not become final until after the hearing-and-appeal process runs its course, it does not follow that Dr. Morice should be granted provisional privileges in the meantime. The status quo at the time Dr. Morice sought review of the MEC's decision was

---

[58] *See* R. Docs. 54-7 at 22-23; 59-1 at 22-23.
[59] *See* R. Doc. 54-3 at 1.

that he had no obstetrical privileges: they had lapsed in August 2018 when his suspension began. Dr. Morice could regain such privileges only by means of the reappointment process outlined in the Bylaws, which he did initiate (albeit tardily, in December 2018) and which he continues to pursue today through the hearing-and-appeal procedures. It is not the purpose of a preliminary injunction to award affirmative relief to a movant, which would be the effect of this Court's requiring TRMC to grant Dr. Morice provisional obstetrical privileges; instead, at most, a preliminary injunction should maintain the status quo, which, in this case, leaves Dr. Morice bereft of the obstetrical privileges he allowed to lapse and only tardily resought.

In sum, Dr. Morice fails to establish a substantial likelihood of success on his breach-of-contract claims related to the Bylaws. And because Dr. Morice is currently pursuing his hearing-and-appeal rights concerning the denial of privileges, a determination of his due-process claims is premature. Regardless, even if Dr. Morice had been able to demonstrate a substantial likelihood of success on the merits of any of his claims, the Court also denies the motion for preliminary injunction because he cannot show a substantial threat of irreparable injury.

### C. Substantial Threat of Irreparable Injury

To prevail on the second element of a preliminary injunction, the movant must show that the threat of injury is likely and irreparable. *See Winter*, 555 U.S. at 22. An injury is irreparable if it cannot be adequately compensated by money damages. *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012). Thus, "only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). Equitable relief is warranted when the injury constitutes "either continuing harm or a real and

immediate threat of repeated injury in the future." *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992).

At the outset, Dr. Morice claims that his inability to care for his patients will cause his patients irreparable injury. However, Dr. Morice lacks standing to seek injunctive relief for harm that will occur to others, even to others who would allegedly benefit from such injunctive relief. *See Nutrition Distrib., LLC v. Enhanced Athlete, Inc.*, 2017 WL 5467252, at *2 (E.D. Cal. Nov. 14, 2017) (refusing to "consider irreparable harm to third parties in lieu of or in addition to irreparable harm to Plaintiff"); *see also Wooten v. BNSF Ry. Co.*, 2017 WL 1089546, at *1 (D. Mont. Mar. 21, 2017) ("harms alleged against third parties are not relevant to the irreparable harm prong of the *Winter* analysis"). Dr. Morice cites *New Orleans Home for the Incurables, Inc. v. Greenstein*, 911 F. Supp. 2d 386 (E.D. La. 2012), for the proposition that patient well-being should be considered when determining a health care provider's irreparable harm. But *Greenstein* is inapposite. In *Greenstein,* the court relied on expert testimony that the nursing home's residents would suffer "transfer trauma" when moved to a new facility if the nursing home was forced to close. *Id.* at 409-10. Here, Dr. Morice presented no expert evidence that his OB patients would be harmed without his care. And TRMC presented the testimony of its quality resource officer to say that Dr. Morice's patients were receiving adequate care from other physicians. Moreover, based upon Dr. Morice's alleged violations of professional care, his suspension, and the denial of obstetrical privileges, the hospital's peer review process purports to have acted in the interest of patient care. Therefore, the alleged harm to Dr. Morice's patients does not, in these circumstances, support Dr. Morice's showing of irreparable harm.

As a result, Dr. Morice's claims of injury are narrowed to his loss of business and are merely economic – which are typically compensable.[60] "The lost goodwill of a business operated over a short period of time is usually compensable in money damages." *DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990). "Simply arguing that a company is losing customers and goodwill without showing that monetary damages are an inadequate remedy is insufficient to establish irreparable harm." *Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 620 (W.D. La. 2010).

Dr. Morice attempts to meet that high burden by asserting that his medical practice will go out of business and that he will be unable to fund the litigation if an injunction does not issue. While exceptional economic harm may constitute irreparable harm where the existence of the business will likely cease, *see Atwood Turnkey Drilling, Inc.*, 875 F.2d at 1179, where bankruptcy is imminent, *see Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975), or where the plaintiff is unable to fund ongoing litigation, *see Milsen Co. v. Southland Corp.*, 454 F.2d 363, 367 (7th Cir. 1971), Dr. Morice fails to present credible evidence of any of these circumstances. Without reference to financial statements or other corroborating evidence, Dr. Morice simply declares, "The potential economic loss to me and my practice which will result from allowing TRMC and/or its MEC to deny me obstetrics privileges during the administrative and appeals process relating to the issues set forth in Greg Stock's letter of January 14, 2019 will threaten the existence of my

---

[60] Dr. Morice also cites *Cole v. St. James Healthcare*, 199 P.3d 810 (2008), and *Doe v. Thompson*, 332 F. Supp. 2d 124, 130-31 (D.D.C. 2004), for the proposition that Defendants' report to the National Practitioner's Data Bank ("NPDB") constitutes irreparable injury. TRMC's reports to the NPDB were made in connection with Dr. Morice's suspension so his request for injunctive relief as to such reports is moot. *See supra* notes 25 & 42. Moreover, were it necessary to address this contention, the Court finds that the cases do not stand for the proposition for which Dr. Morice cites them. The Montana Supreme Court in *Cole* did not hold that irreparable harm existed when it issued an injunction under its disjunctive state standard for a preliminary injunction. 199 P.3d at 813, 818. And no proposed injunction was before the district court in *Thompson*, so it did not decide the question of irreparable harm but only addressed the Privacy Act's protections with respect to statutes authorizing the Department of Health and Human Services to maintain the NPDB. *See* 332 F. Supp. 2d at 124-32.

business as a practicing gynecologist and obstetrician," and "cause me to lose the ability to carry on and continue prosecution of this lawsuit."[61] As the lone witness at the preliminary injunction hearing, Dr. Morice's testimony repeated the same *ipse dixit* assertions and offered no specific or corroborating details. The cases upon which Dr. Morice relies represent more than mere talisman, and his conclusory and self-serving statements hold little weight against Defendants' unrefuted response that Dr. Morice's gynecological privileges permit him to continue at least that part of his medical practice at TRMC and elsewhere.[62] *See BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996) (refusing to credit a solitary, conclusory, and self-serving statement contradicted by other evidence); *see also United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (affidavit containing self-serving allegation not probative evidence).

## IV. CONCLUSION

Accordingly, considering the foregoing reasons,

**IT IS ORDERED** that the motion for preliminary injunction (R. Doc. 54) is DENIED.

**IT IS FURTHER ORDERED** that Dr. Morice's earlier motion for preliminary injunction (R. Doc. 22) and motion to set status conference (R. Doc. 20) are DENIED as moot.

New Orleans, Louisiana, this 8th day of April, 2019.

                                                                                         BARRY W. ASHE
                                                                                         UNITED STATES DISTRICT JUDGE

---

[61] R. Doc. 73-1 at 5.
[62] Dr. Morice suggests that a recent letter from TRMC threatens to revoke his gynecological privileges. But the letter merely reminds Dr. Morice of his obligation to provide call coverage with respect to patients; it does not amount to an adverse recommendation regarding, much less a revocation of, his gynecological privileges. *See* R. Doc. 71-3.